(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## REPUBLIC OF ARGENTINA *v.* NML CAPITAL, LTD.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 12–842.  Argued April 21, 2014—Decided June 16, 2014

After petitioner, Republic of Argentina, defaulted on its external debt, respondent, NML Capital, Ltd. (NML), one of Argentina's bondholders, prevailed in 11 debt-collection actions that it brought against Argentina in the Southern District of New York.  In aid of executing the judgments, NML sought discovery of Argentina's property, serving subpoenas on two nonparty banks for records relating to Argentina's global financial transactions.  The District Court granted NML's motions to compel compliance.  The Second Circuit affirmed, rejecting Argentina's argument that the District Court's order transgressed the Foreign Sovereign Immunities Act of 1976 (FSIA or Act).

*Held*: No provision in the FSIA immunizes a foreign-sovereign judgment debtor from postjudgment discovery of information concerning its extraterritorial assets.  Pp. 4–12.

  (a) This Court assumes without deciding that, in the ordinary case, a district court would have the discretion under Federal Rule of Civil Procedure 69(a)(2) to permit discovery of third-party information bearing on a judgment debtor's extraterritorial assets.  Pp. 4–5.

  (b) The FSIA replaced an executive-driven, factor-intensive, loosely common-law-based immunity regime with "a comprehensive framework for resolving any claim of sovereign immunity."  *Republic of Austria* v. *Altmann*, 541 U. S. 677, 699.  Henceforth, any sort of immunity defense made by a foreign sovereign in an American court must stand or fall on the Act's text.  The Act confers on foreign states two kinds of immunity.  The first, jurisdictional immunity (28 U. S. C. §1604), was waived here.  The second, execution immunity, generally shields "property in the United States of a foreign state" from attachment, arrest, and execution.  §§1609, 1610.  See also §1611(a), (b)(1), (b)(2).  The Act has no third provision forbidding or

Syllabus

limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets.  Far from containing the "plain statement" necessary to preclude application of federal discovery rules, *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for Southern Dist. of Iowa*, 482 U. S. 522, 539, the Act says not a word about postjudgment discovery in aid of execution.

Argentina's arguments are unavailing.  Even if Argentina were correct that §1609 execution immunity implies coextensive discovery-in-aid-of-execution immunity, the latter would not shield from discovery a foreign sovereign's extraterritorial assets, since the text of §1609 immunizes only foreign-state property "in the United States." The prospect that NML's general request for information about Argentina's worldwide assets may turn up information about property that Argentina regards as immune does not mean that NML cannot pursue discovery of it.  Pp. 5–10.

695 F. 3d 201, affirmed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, BREYER, ALITO, and KAGAN, JJ., joined. GINSBURG, J., filed a dissenting opinion.  SOTOMAYOR, J., took no part in the decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–842

_____

## REPUBLIC OF ARGENTINA, PETITIONER *v.* NML CAPITAL, LTD.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 16, 2014]

JUSTICE SCALIA delivered the opinion of the Court.

We must decide whether the Foreign Sovereign Immu-
nities Act of 1976 (FSIA or Act), 28 U. S. C. §§1330, 1602
*et seq.*, limits the scope of discovery available to a judg-
ment creditor in a federal postjudgment execution pro-
ceeding against a foreign sovereign.

## I. Background

In 2001, petitioner, Republic of Argentina, defaulted on
its external debt. In 2005 and 2010, it restructured most
of that debt by offering creditors new securities (with less
favorable terms) to swap out for the defaulted ones. Most
bondholders went along. Respondent, NML Capital, Ltd.
(NML), among others, did not.

NML brought 11 actions against Argentina in the
Southern District of New York to collect on its debt, and
prevailed in every one.[1]  It is owed around $2.5 billion,

---

[1] The District Court's jurisdiction rested on Argentina's broad waiver
of sovereign immunity memorialized in its bond indenture agreement,
which states: "To the extent that [Argentina] or any of its revenues,
assets or properties shall be entitled . . . to any immunity from suit . . .
from attachment prior to judgment . . . from execution of a judgment or

which Argentina has not paid. Having been unable to collect on its judgments from Argentina, NML has attempted to execute them against Argentina's property. That postjudgment litigation "has involved lengthy attachment proceedings before the district court and multiple appeals." *EM Ltd.* v. *Republic of Argentina*, 695 F. 3d 201, 203, and n. 2 (CA2 2012) (referring the reader to prior opinions "[f]or additional background on Argentina's default and the resulting litigation").

Since 2003, NML has pursued discovery of Argentina's property. In 2010, "'[i]n order to locate Argentina's assets and accounts, learn how Argentina moves its assets through New York and around the world, and accurately identify the places and times when those assets might be subject to attachment and execution (whether under [United States law] or the law of foreign jurisdictions),'" *id.,* at 203 (quoting NML brief), NML served subpoenas on two nonparty banks, Bank of America (BOA) and Banco de la Nación Argentina (BNA), an Argentinian bank with a branch in New York City. For the most part, the two subpoenas target the same kinds of information: documents relating to accounts maintained by or on behalf of Argentina, documents identifying the opening and closing dates of Argentina's accounts, current balances, transaction histories, records of electronic fund transfers, debts owed by the bank to Argentina, transfers in and out of Argentina's accounts, and information about transferors and transferees.

Argentina, joined by BOA, moved to quash the BOA subpoena. NML moved to compel compliance but, before

_____

from any other legal or judicial process or remedy, . . . [Argentina] has irrevocably agreed not to claim and has irrevocably waived such immunity to the fullest extent permitted by the laws of such jurisdiction (and consents generally for the purposes of the [FSIA] to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment) . . . ." App. 106–107.

the court ruled, agreed to narrow its subpoenas by excluding the names of some Argentine officials from the initial electronic-fund-transfer message search. NML also agreed to treat as confidential any documents that the banks so designated.

The District Court denied the motion to quash and granted the motions to compel. Approving the subpoenas in principle, it concluded that extraterritorial asset discovery did not offend Argentina's sovereign immunity, and it reaffirmed that it would serve as a "clearinghouse for information" in NML's efforts to find and attach Argentina's assets. App. to Pet. for Cert. 31. But the court made clear that it expected the parties to negotiate further over specific production requests, which, the court said, must include "some reasonable definition of the information being sought." *Id.*, at 32. There was no point, for instance, in "getting information about something that might lead to attachment in Argentina because that would be useless information," since no Argentinian court would allow attachment. *Ibid.* "Thus, the district court . . . sought to limit the subpoenas to discovery that was reasonably calculated to lead to attachable property." 695 F. 3d, at 204–205.

NML and BOA later negotiated additional changes to the BOA subpoena. NML expressed its willingness to narrow its requests from BNA as well, but BNA neither engaged in negotiation nor complied with the subpoena.

Only Argentina appealed, arguing that the court's order transgressed the Foreign Sovereign Immunities Act because it permitted discovery of Argentina's extraterritorial assets. The Second Circuit affirmed, holding that "because the Discovery Order involves discovery, not attachment of sovereign property, and because it is directed at third-party banks, not at Argentina itself, Argentina's sovereign immunity is not infringed." *Id.,* at 205.

We granted certiorari. 571 U. S. \_\_\_ (2014).

## II. Analysis

### A

The rules governing discovery in postjudgment execution proceedings are quite permissive. Federal Rule of Civil Procedure 69(a)(2) states that, "[i]n aid of the judgment or execution, the judgment creditor . . . may obtain discovery from any person—including the judgment debtor— as provided in the rules or by the procedure of the state where the court is located." See 12 C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure §3014, p. 160 (2d ed. 1997) (hereinafter Wright & Miller) (court "may use the discovery devices provided in [the federal rules] or may obtain discovery in the manner provided by the practice of the state in which the district court is held"). The general rule in the federal system is that, subject to the district court's discretion, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. Rule Civ. Proc. 26(b)(1). And New York law entitles judgment creditors to discover "all matter relevant to the satisfaction of [a] judgment," N. Y. Civ. Prac. Law Ann. §5223 (West 1997), permitting "investigation [of] any person shown to have any light to shed on the subject of the judgment debtor's assets or their whereabouts," D. Siegel, New York Practice §509, p. 891 (5th ed. 2011).

The meaning of those rules was much discussed at oral argument. What if the assets targeted by the discovery request are beyond the jurisdictional reach of the court to which the request is made? May the court nonetheless permit discovery so long as the judgment creditor shows that the assets are recoverable under the laws of the jurisdictions in which they reside, whether that be Florida or France? We need not take up those issues today, since Argentina has not put them in contention. In the Court of Appeals, Argentina's only asserted ground for objection to

the subpoenas was the Foreign Sovereign Immunities Act. See 695 F. 3d, at 208 ("Argentina argues . . . that the normally broad scope of discovery in aid of execution is limited in this case by principles of sovereign immunity"). And Argentina's petition for writ of certiorari asked us to decide only whether that Act "imposes [a] limit on a United States court's authority to order blanket post-judgment execution discovery on the assets of a foreign state used for any activity anywhere in the world." Pet. for Cert. 14. Plainly, then, this is not a case about the breadth of Rule 69(a)(2).[2] We thus assume without deciding that, as the Government conceded at argument, Tr. of Oral Arg. 24, and as the Second Circuit concluded below, "in a run-of-the-mill execution proceeding . . . the district court would have been within its discretion to order the discovery from third-party banks about the judgment debtor's assets located outside the United States." 695 F. 3d, at 208. The single, narrow question before us is whether the Foreign Sovereign Immunities Act specifies a different rule when the judgment debtor is a foreign state.

B

To understand the effect of the Act, one must know something about the regime it replaced. Foreign sovereign immunity is, and always has been, "a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983). Accordingly, this Court's practice has been to "defe[r] to the decisions of the political branches" about whether and

---

[2] On one of the final pages of its reply brief, Argentina makes for the first time the assertion (which it does not develop, and for which it cites no authority) that the scope of Rule 69 discovery in aid of execution is limited to assets upon which a United States court can execute. Reply Brief 19. We will not revive a forfeited argument simply because the petitioner gestures toward it in its reply brief.

when to exercise judicial power over foreign states. *Ibid.* For the better part of the last two centuries, the political branch making the determination was the Executive, which typically requested immunity in all suits against friendly foreign states. *Id.,* at 486–487. But then, in 1952, the State Department embraced (in the so-called Tate Letter) the "restrictive" theory of sovereign immunity, which holds that immunity shields only a foreign sovereign's public, noncommercial acts. *Id.*, at 487, and n. 9. The Tate Letter "thr[ew] immunity determinations into some disarray," since "political considerations sometimes led the Department to file suggestions of immunity in cases where immunity would not have been available under the restrictive theory." *Republic of Austria* v. *Altmann*, 541 U. S. 677, 690 (2004) (internal quotation marks omitted). Further muddling matters, when in particular cases the State Department did *not* suggest immunity, courts made immunity determinations "generally by reference to prior State Department decisions." *Verlinden*, 461 U. S., at 487. Hence it was that "sovereign immunity decisions were [being] made in two different branches, subject to a variety of factors, sometimes including diplomatic considerations. Not surprisingly, the governing standards were neither clear nor uniformly applied." *Id.,* at 488.

Congress abated the bedlam in 1976, replacing the old executive-driven, factor-intensive, loosely common-law-based immunity regime with the Foreign Sovereign Immunities Act's "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *Ibid*. The key word there—which goes a long way toward deciding this case—is *comprehensive.* We have used that term often and advisedly to describe the Act's sweep: "Congress established [in the FSIA] a comprehensive framework for resolving any claim of sovereign immunity." *Altman*, 541 U. S., at 699. The Act "compre-

hensively regulat[es] the amenability of foreign nations to suit in the United States." *Verlinden*, *supra*, at 493. This means that "[a]fter the enactment of the FSIA, the Act— and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity." *Samantar* v. *Yousuf*, 560 U. S. 305, 313 (2010). As the Act itself instructs, "[c]laims of foreign states to immunity should henceforth be decided by courts . . . in conformity with the principles *set forth in this [Act]*." 28 U. S. C. §1602 (emphasis added). Thus, any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall.

The text of the Act confers on foreign states two kinds of immunity. First and most significant, "a foreign state shall be immune from the jurisdiction of the courts of the United States . . . except as provided in sections 1605 to 1607." §1604. That provision is of no help to Argentina here: A foreign state may waive jurisdictional immunity, §1605(a)(1), and in this case Argentina did so, see 695 F. 3d, at 203. Consequently, the Act makes Argentina "liable in the same manner and to the same extent as a private individual under like circumstances." §1606.

The Act's second immunity-conferring provision states that "the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter." §1609. The exceptions to this immunity defense (we will call it "execution immunity") are narrower. "The property in the United States of a foreign state" is subject to attachment, arrest, or execution if (1) it is "used for a commercial activity in the United States," §1610(a), *and* (2) some other enumerated exception to immunity applies, such as the one allowing for waiver, see §1610(a)(1)–(7). The Act goes on to confer a more robust execution immunity on designated international-organization property,

§1611(a), property of a foreign central bank, §1611(b)(1), and "property of a foreign state . . . [that] is, or is intended to be, used in connection with a military activity" and is either "of a military character" or "under the control of a military authority or defense agency," §1611(b)(2).

That is the last of the Act's immunity-granting sections. There is no third provision forbidding or limiting discovery in aid of execution of a foreign-sovereign judgment debtor's assets. Argentina concedes that no part of the Act "expressly address[es] [postjudgment] discovery." Brief for Petitioner 22. Quite right. The Act speaks of discovery only once, in a subsection requiring courts to stay discovery requests directed to the United States that would interfere with criminal or national-security matters, §1605(g)(1). And that section explicitly suspends certain Federal Rules of Civil Procedure when such a stay is entered, see §1605(g)(4). Elsewhere, it is clear when the Act's provisions specifically applicable to suits against sovereigns displace their general federal-rule counterparts. See, *e.g.*, §1608(d). Far from containing the "plain statement" necessary to preclude application of federal discovery rules, *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for Southern Dist. of Iowa*, 482 U. S. 522, 539 (1987), the Act says not a word on the subject.[3]

Argentina would have us draw meaning from this silence. Its argument has several parts. First, it asserts that, before and after the Tate Letter, the State Department and American courts routinely accorded *absolute* execution immunity to foreign-state property. If a thing belonged to a foreign sovereign, then, no matter where it

---

[3] Argentina and the United States suggest that, under the terms of Rule 69 itself, the Act trumps the federal rules, since Rule 69(a)(1) states that "a federal statute governs to the extent it applies." But, since the Act does not contain implicit discovery-immunity protections, it does not "apply" (in the relevant sense) at all.

was found, it was immune from execution. And absolute immunity from *execution* necessarily entailed immunity from *discovery in aid of execution*. Second, by codifying execution immunity with only a small set of exceptions, Congress merely "partially lowered the previously unconditional barrier to post-judgment relief." Brief for Petitioner 29. Because the Act gives "no indication that it was authorizing courts to inquire into state property beyond the court's limited enforcement authority," *ibid.*, Argentina contends, discovery of assets that do not fall within an exception to execution immunity (plainly true of a foreign state's extraterritorial assets) is forbidden.

The argument founders at each step. To begin with, Argentina cites no case holding that, before the Act, a foreign state's extraterritorial assets enjoyed absolute execution immunity in United States courts. No surprise there. Our courts generally lack authority in the first place to execute against property in other countries, so how could the question ever have arisen? See Wright & Miller §3013, at 156 ("[A] writ of execution . . . can be served anywhere within the state in which the district court is held"). More importantly, even if Argentina were right about the scope of the common-law execution-immunity rule, then it would be obvious that the terms of §1609 execution immunity are narrower, since the text of that provision immunizes only foreign-state property "*in the United States*." So even if Argentina were correct that §1609 execution immunity implies coextensive discovery-in-aid-of-execution immunity, the latter would not shield from discovery a foreign sovereign's extraterritorial assets.

But what of foreign-state property that *would* enjoy execution immunity under the Act, such as Argentina's diplomatic or military property? Argentina maintains that, if a judgment creditor could not ultimately execute a judgment against certain property, then it has no business pursuing discovery of information pertaining to that prop-

erty. But the reason for these subpoenas is that NML *does not yet know* what property Argentina has and where it is, let alone whether it is executable under the relevant jurisdiction's law. If, bizarrely, NML's subpoenas had sought only "information that could not lead to executable assets in the United States or abroad," then Argentina likely would be correct to say that the subpoenas were unenforceable—*not* because information about nonexecutable assets enjoys a penumbral "discovery immunity" under the Act, but because information that could not possibly lead to executable assets is simply not "relevant" to execution in the first place, Fed. Rule Civ. Proc. 26(b)(1); N. Y. Civ. Prac. Law Ann. §5223.[4] But of course that is not what the subpoenas seek. They ask for information about Argentina's worldwide assets generally, so that NML can identify where Argentina may be holding property that *is* subject to execution. To be sure, that request is bound to turn up information about property that Argentina regards as immune. But NML may think the same property *not* immune. In which case, Argentina's self-serving legal assertion will not automatically prevail; the District Court will have to settle the matter.

\* \* \*

Today's decision leaves open what Argentina thinks is a gap in the statute. Could the 1976 Congress really have meant not to protect foreign states from postjudgment

_____

[4]The dissent apparently agrees that the Act has nothing to say about the scope of postjudgment discovery of a foreign sovereign's extraterritorial assets. It also apparently agrees that the rules limit discovery to matters relevant to execution. Our agreement ends there. The dissent goes on to assert that, unless a judgment creditor *proves* up front that all of the information it seeks is relevant to execution under the laws of all foreign jurisdictions, discovery of information concerning extraterritorial assets is limited to that which the Act makes relevant to execution *in the United States*. *Post*, at 2 (opinion of GINSBURG, J.). We can find no basis in the Act or the rules for that position.

discovery "clearinghouses"? The riddle is not ours to solve (if it can be solved at all). It is of course possible that, had Congress anticipated the rather unusual circumstances of this case (foreign sovereign waives immunity; foreign sovereign owes money under valid judgments; foreign sovereign does not pay and apparently has no executable assets in the United States), it would have added to the Act a sentence conferring categorical discovery-in-aid-of-execution immunity on a foreign state's extraterritorial assets. Or, just as possible, it would have done no such thing. Either way, "[t]he question . . . is not what Congress 'would have wanted' but what Congress enacted in the FSIA." *Republic of Argentina* v. *Weltover, Inc.*, 504 U. S. 607, 618 (1992).[5]

Nonetheless, Argentina and the United States urge us to consider the worrisome international-relations consequences of siding with the lower court. Discovery orders as sweeping as this one, the Government warns, will cause "a substantial invasion of [foreign states'] sovereignty," Brief for United States as *Amicus Curiae* 18, and will "[u]ndermin[e] international comity," *id.,* at 19. Worse, such orders might provoke "reciprocal adverse treatment of the United States in foreign courts," *id.,* at 20, and will "threaten harm to the United States' foreign relations more generally," *id.,* at 21. These apprehensions are better directed to that branch of government with authority to amend the Act—which, as it happens, is the same branch that forced our retirement from the immunity-by-factor-balancing business nearly 40 years ago.[6]

––––––––––

[5] NML also argues that, even if Argentina had a claim to immunity from postjudgment discovery, it waived it in its bond indenture agreement, see n. 1, *supra.* The Second Circuit did not address this argument. Nor do we.

[6] Although this appeal concerns only the meaning of the Act, we have no reason to doubt that, as NML concedes, "other sources of law" ordinarily will bear on the propriety of discovery requests of this nature

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SOTOMAYOR took no part in the decision of this case.

---

and scope, such as "settled doctrines of privilege and the discretionary determination by the district court whether the discovery is warranted, which may appropriately consider comity interests and the burden that the discovery might cause to the foreign state." Brief for Respondent 24–25 (quoting *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for Southern Dist. of Iowa*, 482 U. S. 522, 543–544, and n. 28 (1987)).

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–842

_____

## REPUBLIC OF ARGENTINA, PETITIONER *v.* NML CAPITAL, LTD.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 16, 2014]

JUSTICE GINSBURG, dissenting.

The Foreign Sovereign Immunities Act of 1976, 28 U. S. C. §§1330, 1602 *et seq.*, if one of several conditions is met, permits execution of a judgment rendered in the United States against a foreign sovereign only on "property in the United States . . . used for a commercial activity." §1610(a). Accordingly, no inquiry into a foreign sovereign's property in the United States that is not "used for a commercial activity" could be ordered; such an inquiry, as the Court recognizes, would not be "'relevant' to execution in the first place." *Ante*, at 10 (citing Fed. Rule Civ. Proc. 26(b)(1)). Yet the Court permits unlimited inquiry into Argentina's property outside the United States, whether or not the property is "used for a commercial activity." By what authorization does a court in the United States become a "clearinghouse for information," *ante*, at 3 (internal quotation marks omitted), about any and all property held by Argentina abroad? NML may seek such information, the Court reasons, because "NML *does not yet know* what property Argentina has [outside the United States], let alone whether it is executable under the relevant jurisdiction's law." *Ante*, at 10. But see *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for Southern Dist. of Iowa*, 482 U. S. 522, 542 (1987) (observing that other jurisdictions generally allow much

more limited discovery than is available in the United States).

A court in the United States has no warrant to indulge the assumption that, outside our country, the sky may be the limit for attaching a foreign sovereign's property in order to execute a U. S. judgment against the foreign sovereign. Cf. §1602 ("Under international law, . . . th[e] *commercial property* [of a state] may be levied upon for the satisfaction of judgments rendered against [the state] in connection with [its] commercial activities." (emphasis added)). Without proof of any kind that other nations broadly expose a foreign sovereign's property to arrest, attachment or execution, a more modest assumption is in order. See *EM Ltd.* v. *Republic of Argentina*, 695 F. 3d 201, 207 (CA2 2012) (recognizing that postjudgment discovery "must be calculated to assist in collecting on a judgment" (citing Fed. Rules Civ. Proc. 26(b)(1), 69(a)(2))).

Unless and until the judgment debtor, here, NML, proves that other nations would allow unconstrained access to Argentina's assets, I would be guided by the one law we know for sure—our own. That guide is all the more appropriate, as our law coincides with the international norm. See §1602. Accordingly, I would limit NML's discovery to property used here or abroad "in connection with . . . commercial activities." §§1602, 1610(a). I therefore dissent from the sweeping examination of Argentina's worldwide assets the Court exorbitantly approves today.